HEIRS OF ADELAIDE BORDELON *v.* HEIRS OF GEORGE BARON.

The terms " *caused it to be written,*" in Art. 1574 C. C. mean that the testator must have himself
dictated the provisions of a will reduced to writing by another.

A nuncupative will, written by one who does not understand the language in which the will is dic-
tated, but who receives his instructions from the testator, through an interpreter, is invalid.

A nuncupative will, under private signature, which has been read, to the testator in a language
which he could not comprehend without the aid of an interpreter, is invalid.

It is necessary to the validity of such a will that the witnesses should understand the language in
which it is written and read.

APPEAL from the District Court of the parish of Avoyelles, *Ogden*, J.
*Barlow & Waddill*, for plaintiffs and appellees. *Taylor & Lewis*, for de-
fendants and appellants.

SPOFFORD, J. The appellees, as collateral heirs of *Adelaide Bordelon*, sue
to recover from the heirs of her deceased husband, *George Baron*, her succes-
sion, consisting of the sum of twenty-eight hundred dollars, inherited by her
and received by her said husband, and one-half of the estate in community
between them, amounting to the further sum of thirty-one thousand two hun-
dred and seventy eight dollars.

The appellants' title to the property in litigation rests upon the last will and
testament, of the nuncupative form, under private signature, made by the de-
ceased, *Adelaide Bordelon*, on the 9th of May, 1835, and which was admitted
to probate on the 17th of February, 1853. The testatrix died in the month of
January previous, and her husband, *George Baron*, in the April following. The
testatrix survived her mother and only forced heir living at the date of the will,
and at the time of her death had no issue born of the marriage.

The present action has a threefold object: first, to have the nullity of *Ma-
dame Baron's* testament declared for alleged vices in the confection thereof;
secondly, to enforce an alleged compromise between the parties, whereby they
are said to have agreed to set aside the will and partake the property in certain
proportions; and thirdly, in case the former demands should fail, to procure a
judicial construction of the will, which will defeat the pretensions of the de-
fendants under the bequest to *George Baron*, and leave the property to descend
to the plaintiffs as heirs at law.

The opinion of the District Judge was favorable to the views of the plaintiffs,
on the first and third of the foregoing points; and the defendants have ap-
pealed from a judgment overruling their claims under the will.

The testament in question is of the following tenor:

"Parish of Avoyelles, State of Louisiana. In the name of God, amen. I,
*Adelaide Bordelon*, of the parish of Avoyelles and State of Louisiana, consid-
ering the uncertainty of this life, and being of sound and perfect mind and
memory, blessed be the Almighty God for the same, and in consideration of
the love and affection which I entertain for *George Baron*, my true and lawful
husband, and in consequence of my having no children or legitimate descen-
dants, do make and publish this my last nuncupative will and testament, by
private act, in the manner and form following, to wit:

"I do give and bequeath unto my true, devoted and beloved husband, *George
Baron*, the whole of my property that I now possess, and which I may possess

at my death, including movables, immovables, slaves, rights and credits. But in case there should be, at my death, any heirs whom the law may deem forced heirs, then and in that case I do bequeath all that part of my property which by law I may be allowed to dispose of, whether movables, immovables, slaves, rights and credits, unto my beloved husband, *George Baron*, to have and to hold the same unto the said *George Baron*, my beloved husband, by the title of *donation mortis causa*. This donation is made upon the condition that if the said *George Baron*, my husband as aforesaid, should die without leaving children of the present marriage living at the time of her decease, that then and in that case, the aforesaid property shall revert to and become the property of myself, as if this donation had never been made. Finally, I do by these presents appoint my beloved husband, *George Baron*, my sole executor of this my last will and testament, and he is hereby authorized and empowered to take possession and make an inventory of my estate, without the intervention of any court of judicature in this State or any State of the Union.

"In testimony whereof, I have hereunto set my hand this day, by making my ordinary mark, not being able to write my name.            Her

                    "Signed                                *Adelaide* ⋈ *Bordelon.*
"May 9th, 1855.                                              mark.

"The above named *Adelaide Bordelon* presented this paper, and declared the same to be her last will and testament, in the presence of *James Rey, Jr., John P. Sanders, Albert G. Morrow, Leandre Guillot* and *Ralph Cushman,* all residing in the parish of Avoyelles, who were called upon by the said *Adelaide Bordelon* to witness the same. The above will was written from her dictation by *Ralph Cushman,* one of the witnesses, and that she signed the same in our presence, after having been read to the testatrix by *Ralph Cushman,* one of the witnesses, to the other witnesses, in an audible and distinct voice, before signing.

"Signed, *Rey, Jr., John P. Sanders, Albert G. Morrow, Leandre Guillot, Ralph Cushman.*

"May 9th, 1835.            . Ne varietur: *J. H. Barbin,* Clerk."

Upon the first point, relative to the execution of the will, the proof is that the vernacular tongue of the testatrix was French, and that she could neither speak nor comprehend, in any degree, the English language; that the original, from which the will actually signed was copied, was written by *Ralph Cushman,* who, at the time, could not speak the French language, and could understand but a few words of it when spoken, so that, without the aid of an interpreter, he was incapable of transacting ordinary business with persons who spoke only French; that from the *projet* in his handwriting, his wife copied the foregoing instrument down to the proces verbal of the signing, which he wrote himself in presence of the witnesses; that he read the will in English to the testatrix, in presence of the witnesses; that one of the other witnesses attempted to make a literal translation of it to the testatrix at the same time, but, from ignorance of one of the languages, or of legal terms, succeeded so badly that another witness occasionally interfered to help him; but there is no proof of the mode by which *Cushman* was enabled to write a will for a testatrix with whom it was impossible for him to communicate by any language common to them both; or of the time when and place where the original draft was made.

A bill of exceptions was taken to the ruling of the District Judge in admitting testimony to show *Ralph Cushman's* ignorance of the French language.

The objection was that such a fact was not put at issue by the pleadings. No surprise at the testimony was averred, and no continuance appears to have been asked, for the purpose of procuring rebutting evidence.

We do not perceive that the court erred. An amended petition, filed some time previously, had set forth, as a specific ground for annulling the will, that, from entire ignorance of the English language, the testatrix was absolutely disqualified from dictating her will in the language in which it was written, and further, that the said will was not written by the witness *Cushman*, as alleged. Now the proces verbal alleged, that "the will was written *from her dictation* by *Ralph Cushman*," and the evidence was competent, as tending to establish the averments of the amended petition.

Upon these facts, we are to pronounce whether the will can stand under our law as a valid will in the nuncupative form under private signature, for it is not pretended, that it meets the requirements of any other form.

The Louisiana Code declares, that such a testament "must be written by the testator himself, or by any other person from his dictation; or even by one of the witnesses, in presence of five witnesses residing in the place where the will is received, or of seven witnesses residing out of that place; or it will suffice if, in the presence of the same number of witnesses, the testator presents the paper on which he has written his testament, or caused it to be written, out of their presence, declaring to them that that paper contains his last will." C. C. 1574.

"In either case the testament must be read by the testator to the witnesses, or by one of the witnesses to the rest, in presence of the testator; it must be signed by the testator, if he knows how or is able to sign, and by the witnesses, or at least by two of them, in case the others know not how to sign; and those of the witnesses who do not know how to sign must affix their mark.

"This testament is subject to no other formality than those prescribed by this and the preceding Article." C. C. 1575.

What does the Article 1574 mean by the expression "caused to be written?" Does it mean merely that the testator may order some person to write a will for him, without intimating what its contents are to be, and then, without understanding what its provisions are, or even the language in which those provisions are couched, may make it his own by declaring it to be his last will in the presence of the competent number of witnesses?

We think not. The very term *will* implies an independent volition. To make a will at all, the testator is required to have a *disposing* mind, capable of originating, and which does originate, the plan whereby the descent of his property is to be regulated after his death. The term *nuncupative* also, as applied to this form of wills, is not without a meaning; it shows that the lawgiver contemplated a declaration by the testator of the intentions which he announces from his own mouth, although they may be clothed in a written form by the hand of another. But in all cases the office of the other person who writes the will is that of an amanuensis. If his is the controlling mind, if he originates and prepares the dispositions which are but imperfectly understood by the testator, the will is not the will of the latter but of the former. So also, if he writes from the dictation of another person than the testator. See *Heirs of De Bardelabon* v. *Averett*, 11 An.

But we are not left to inference upon this subject. So provident is the law respecting that highest of all the rights of property—the owner's right of

directing its descent by a sort of posthumous dominion—so jealous is it of any interference or suggestion on the part of other persons, that it has disclosed, in positive terms, how the thoughts of the testator shall be conveyed into the instrument which must faithfully embody them in order to constitute his *will.*

"Testaments, whether nuncupative or mystic, must be drawn up in writing, either by the testator himself or by some other person *under his dictation,* (soit par le testateur lui même, soit *sous sa dictée* par toute autre personne." C. C. 1568.

This injunction applies equally to both classes of nuncupative testaments. When, therefore, the subsequent Article 1574 speaks of a will which the testator has "caused to be written," it means that he must have caused it to be written in the only mode pointed out by the law itself, *i. e.* by some other person under his dictation. The draftsman who frames the will must take his instructions from the mouth of the testator. To do so he must comprehend the testator's language. See *Gonzales* v. *Gonzales,* 13 L. 105.

The wisdom of this provision of the law is apparent. Nothing is more evanescent than spoken words, nothing more liable to be changed and warped than such words passing successively from mouth to mouth. By writing under the dictation of the original speaker, an amanuensis may stamp his thoughts correctly upon paper, but by writing under the dictation of another person, who professes to report, from his own memory, the original speaker's words, there is a double chance for error; and the chances of error increase in geometrical progression with the number of intervening oral reporters. It is partly upon this principle that hearsay testimony is excluded by courts of justice.

But, without going further into the reason of the rule, it suffices that the rule is in the Code, and we cannot swerve from the duty of applying it to the cases that come before us for adjudication. It was manifestly impossible for *Ralph Cushman* to have written the will in question *under the dictation of the testatrix* in the sense of the law, although he doubtless thought that he had substantially complied with the directions of the Code ; and, therefore, no imputation is cast upon his good-faith. At the time of the trial in the court below, he was no longer alive to explain the process by which he supposed he had attained to a knowledge of the wishes of the testatrix. But, one person at least must have stood between him and her, upon whose honesty, accuracy of recollection, and skill in translating French into English, the character of the will must depend. Perhaps more than one person intervened between the maker and the writer of the will. We know not who they were, for this subject is wrapt in obscurity. However reputable the character and fair the conduct of the parties who do appear in connection with this testament, we are compelled to pronounce its nullity.

If we once depart from the salutary rule that every will, unless written by the testator himself must be written under his dictation, we shall render it possible for any sort of a will to be palmed upon a person *in extremis.*

Without conceding that this radical defect in drafting the testatment of *Madame Baron* could be cured by a subsequent compliance with the requisites of Article 1575 of the Code, we may remark that the fact of such compliance is exceedingly doubtful. That Article declares that the will must be read by the testator or to the testator in the presence of the witnesses. This is not an empty form. It is intended to guard against imposition, and to verify the instrument as the real and unchanged will which the testator has written or dictated. A

BORDELON
v.
BARON.

deaf person cannot be a witness, because he cannot hear this reading and help to verify it. The reading is of no avail if the testator cannot comprehend the language. The reading of this will in English conveyed no information to *Madame Baron,* and did not enable it to say that it was her will. The attempted oral translation of it into French by one of the witnesses in her presence, did not enable the witness *Cushman* to say that she approved what he had written, for he could not know that the same ideas were conveyed by the French interpretation, as were embodied in the English original. The remarks of the court in *Herbert's Heirs* v. *Herbert's Legatees,* 11 L. 365, seem to indicate that this defect also would vitiate the execution of the will.

It is doubtful, in the present instance, whether the testatrix ever understood the will she signed.

Having found the first branch of the case in favor of the plaintiffs, we are spared the necessity of endeavoring to interpret an instrument which is ambiguous, if not incomprehensible upon its face.

Judgment affirmed.

BUCHANAN, J. The parties have agreed that the decree of the court rendered at this term and affirming the judgment of the District Court of Avoyelles, should be amended so as to conform to the evidence in the record in relation to the amount of the paraphernal rights of *Mrs. Baron.*

The petition in the cause states the amount of those rights to be two thousand eight hundred dollars, and judgment was rendered by the District Court for that amount.

The case was argued before us on appeal entirely in reference to the main question of the validity of *Mrs. Baron's* will, wthout any intimation that the amount of the paraphernal right stated in the petition, and recognized in the judgment, was not in accordance with the evidence.

The judgment was affirmed generally. Since this affirmation it is suggested, in a petition for re-hearing, by counsel of appellants, that the notarial receipt of *Mrs. Baron* to the administrator of her mother's estate, given in evidence on the trial of the cause, shows that the amount received by *Mrs. Baron* from the succession of her mother was $2336 87, instead of $2800.

The counsel of appellees admits the correctness of this suggestion, (which is also apparent from the record,) and has consented that the judgment be amended accordingly, without the formality of a re-hearing.

It is, therefore, adjudged and decreed that our judgment heretofore rendered in this case be set aside ; that the judgment of the District Court be amended ; that the plaintiffs recover of the succession of *George Baron* the sum of twenty-three hundred and thirty-six dollars and eighty-seven cents, instead of twenty-eight hundred dollars, with five per cent. per annum interest from January 31st, 1853, until paid ; that in other respects the judgment of the District Court be affirmed ; that the costs of the District Court be paid by defendants, and those of appeal by plaintiffs and appellees.